AO 91 (Rev. 11/11)  Criminal Complaint

| | | | |
|---|---|---|---|
| AUSA: | DePorre | Telephone: | (810) 766-5177 |
| Special Agent: | Gramer, HUD-OIG | Telephone: | (313) 234-7416 |

# UNITED STATES DISTRICT COURT
for the

Eastern District of Michigan

| | |
|---|---|
| United States of America<br>v.<br>Teresa Trantham, | Case: 4:22−mj−30532<br>Assigned To : Ivy, Curtis, Jr<br>Assign. Date : 12/16/2022<br>Description: IN RE SEALED MATTER (kcm) |

**CRIMINAL COMPLAINT**

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of   December 31, 2017 - April 15, 2021   in the county of   Genesee   in the   Eastern   District of   Michigan  , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 666(a)(1)(A) | Theft from a program receiving federal funds |
| 18 U.S.C. § 641 | Theft of public funds |
| 18 U.S.C. § 1343 | Wire fraud |

This criminal complaint is based on these facts:

There is probable cause that between December 31, 2017 and April 15, 2021, Teresa Trantham, violated 18 U.S.C. § 666(a)(1)(A) (theft from a program receiving federal funds), 18 U.S.C. § 641 (theft of public funds), and 18 U.S.C. § 1343 (wire fraud).

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Alexandra Gramer, Special Agent, HUD-OIG
*Printed name and title*

Sworn to before me and signed in my presence
and/or by reliable electronic means.

Date: December 16, 2022

City and state:  Flint, MI

_____
*Judge's signature*

Curtis Ivy, Jr, United States Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Special Agent Alexandra Gramer, being duly sworn, hereby depose and state as follows:

### Introduction and Agent Background

1.  I am a Special Agent with the United States Department of Housing and Urban Development—Office of Inspector General ("HUD-OIG") in Detroit, Michigan. I have been so employed since August 2009. I have completed a 12-week Special Agent training at the Federal Law Enforcement Training Center located in Glynco, Georgia. I have also received training in financial investigative techniques, criminal investigation techniques, criminal law, and search warrants. I have personally conducted or assisted in numerous criminal investigations involving violations of criminal laws involving HUD programs. I also have experience in analyzing documents and records obtained in connection with criminal investigations, and I have been the affiant on multiple affidavits related to these criminal investigations.

2.  I am an investigative and law enforcement officer of the United States who is currently responsible for enforcing and investigating violations of the United States Code relating to the United States Department of Housing and Urban Development programs and regulations. As such, I am authorized to conduct

investigations, and to make arrests for criminal violations of the United States Code.

3.  HUD-OIG and the U.S. Legal Services Corporation—Office of Inspector General ("LSC-OIG") are investigating Teresa Trantham ("Trantham") for violations of federal criminal laws including 18 U.S.C. § 666(a)(1)(A) (theft from a program receiving federal funds), 18 U.S.C. § 641 (theft of public funds), and 18 U.S.C. § 1343 (wire fraud).

4.  All of the statements and information contained in this Affidavit are based upon my personal knowledge, training, and experience, as well as information provided by other law enforcement and/or investigative personnel and obtained through my review of documents and reports. This Affidavit is being submitted for the limited purpose of obtaining an arrest warrant for Trantham, and it does not purport to set forth all of my knowledge about this matter.

**Relevant Statutes**

5.  Title 18, United States Code, Section 666(a)(1)(A) makes it unlawful for an agent of an organization that receives over $10,000 under a Federal program involving a grant, to embezzle, steal, obtain by fraud, or otherwise without authority knowingly convert to the use of any person other than the rightful owner or intentionally misapply, property that is valued at $5,000 or more and is owned by, or is under the care, custody, or control of such organization.

6.  Title 18, United States Code, Section 1343 makes it unlawful to devise or intend to devise a scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, and, for the purposes of executing such scheme or artifice, to transmit or cause another to transmit signals by means of a wire communication in interstate commerce.

7.  Title 18, United States Code, Section 641 makes it unlawful to knowingly embezzle, steal or convert to one's own use or the use of another money of the United States or any department or agency thereof.

8.  I am aware that funds provided by the U.S. Legal Services Corporation ("LSC") to legal aid organizations are considered federal funds, and that LSC is a Federal agency pursuant to 45 C.F.R. 1640.2(b). I am also aware that the LSC website lists 18 U.S.C. § 641 and 18 U.S.C. § 666 as applicable federal laws related to the proper use of federal funds. See https://www.lsc.gov/about-lsc/laws-regulations-and-guidance/lsc-regulations/45-cfr-part-1640-applicable-federal-laws.

9.  Based on my knowledge of HUD grants and my discussion with LSC-OIG personnel, I am aware that both LSC and HUD retain control over their grant funds provided to grant recipients through federal regulations and grant conditions that impose restrictions on how the funds are spent and maintained. In addition, LSC and HUD impose internal controls, audit, and reporting requirements on each grant recipient. LSC and LSC-OIG, as well as HUD and HUD-OIG, have full access to

any grant recipient records and the ability to perform annual audits, investigations, and other reviews of both LSC and LSC grants. Any misspent funds will be questioned and disallowed.

10. Based on my discussion with LSC-OIG personnel, I aware that any unspent funds must be returned to LSC unless a fund balance waiver has been approved. Any income earned by a recipient from LSC-supported activities during the term of an LSC grant or contract, and includes, but is not limited to, income from fees for services (including attorney fee awards and reimbursed costs), sales and rentals of real or personal property, and interest earned on LSC grant or contract advances is considered derivative income and must be attributable to the LSC grant.

## Probable Cause

**LSEM was a member of TAST and was entitled to 50% of TAST's assets upon TAST's dissolution.**

11. On December 2, 2019, a former Staff Attorney at Legal Services of Eastern Michigan ("LSEM") contacted the LSC-OIG Hotline to report allegations against LSEM's Chief Administrative Officer, Theresa Trantham, and against LSEM's former Executive Director, Edward Hoort. The allegations involved activities both at LSEM and at the "low-profit" entity formerly under contract with LSEM called The Administrative Services Team ("TAST"). An LSC-OIG Investigator opened

4

an investigation to look into the allegations, and later contacted me to assist in the investigation.

12. LSEM is a non-profit civil legal service provider located in Flint, Michigan, whose mission is to provide free civil legal services to low-income clients located in Genesee County, Michigan. LSEM is funded by grant funds from federal, state, and local agencies.

13. From 2014 to 2019, U.S. Legal Services Corporation ("LSC") provided over $10 Million in federal grant funds to LSEM, averaging between $1.5 to $1.8 Million each year. From 2014 to 2019, The United States Department of Housing and Urban Development ("HUD") provided over $2 Million in federal grant funds to LSEM, averaging between $260,000 to $455,000 each year.

14. Edward Hoort was employed as the Executive Director for LSEM from July 1985 until his resignation on April 30, 2014, after which he was hired as the Executive Director of TAST.

15. Trantham began employment with LSEM in July 1987 and served as the Deputy Director of Administration from 1992 until her departure on April 30, 2014, to join TAST as their Chief Administrative Officer.

16. On April 25, 2014, Hoort registered TAST with the Michigan Department of Licensing and Regulatory Affairs as a Low-Profit Limited Liability Company. The Articles of Organization stated that the purpose of the company "is to provide

5

supporting services to tax exempt organizations and other nonprofit entities." In addition, "The business of the Company is to be managed by a Board of Managers as appointed in accordance with the Company's Operating Agreement." Hoort remained the Registered Agent as of the last annual statement filed on 1/30/2017.

17. LSEM Board minutes show that on April 16, 2014, the LSEM Executive Committee approved the Operating Agreement ("Operating Agreement") for TAST. The Operating Agreement was made effective on May 1, 2014, by Hoort, on behalf of LSEM (a member) and on behalf of TAST (manager), and Terri Stangl, on behalf of The Genesee County Legal Aid Society d/b/a The Center for Civil Justice ("CCJ") (a member) and on behalf of TAST (manager).

18. The TAST Operating Agreement states that TAST "has been organized as a manager-managed" company. Its members consist of LSEM (500 shares) and CCJ (500 shares). The Operating Agreement stated that TAST "shall be managed by three (3) persons…(1) the Director of [TAST]…(2) the Director LSEM…and (3) the Director of [CCJ]…."

19. The TAST Operating Agreement, Article VIII – Dissolution and Winding Up, Section 8.2 Winding Up, states, "On dissolution, [TAST] shall cease carrying on its business and affairs and begin to wind them up. [TAST] shall complete the winding up as soon as practicable. On the winding up of [TAST], its assets shall be distributed first to creditors, to the extent permitted by law, in satisfaction of

6

[TAST] debts, liabilities, and obligations (including those owed to Members). The remaining assets shall be distributed as a liquidating distribution to the Members who have positive Capital Accounts…The proceeds shall be paid to the Members within 90 days after the date of the winding up."

20.     LSEM Board minutes show that on April 16, 2014, the LSEM Executive Committee approved an Administrative Services Agreement ("Services Agreement") between LSEM and TAST. The Services Agreement went into effect on May 1, 2014, for a term of 56 months, expiring December 31, 2018. In 2016, the Services Agreement was re-drafted and executed to include a more detailed description of services to be provided by TAST.

21.     On April 30, 2014, Hoort resigned from LSEM. Also, Trantham and four (4) administrative employees were terminated from LSEM.

22.     On May 1, 2014, Hoort was hired as the TAST Chief Executive Officer, and Trantham and the four (4) employees terminated from LSEM were hired by TAST. All former LSEM employees' positions, duties, and salaries remained the same when hired by TAST, Except Hoort's.

23.     LSC records show that from 2014 to the end of 2016, LSC issued letters to LSEM regarding its contract with TAST, citing conflict of interest concerns, service costs, and requiring LSEM to amend the contract language in order to ensure compliance with program guidelines.

7

24. On March 31, 2017, the Services Agreement was terminated by mutual agreement, as documented in a February 1, 2017, letter from the LSEM Executive Director to Trantham.

25. In April 2017, Trantham and three (3) other TAST employees were re-hired at LSEM. According to an interview with the LSEM Executive Director, and a May 22, 2017, letter authored by the same, Trantham returned to LSEM on a part-time basis and worked 35 hours per week in order to wind-down the TAST business.

26. According to the LSEM Executive Director, LSEM continued to lease a one-room office to Trantham so she could wind-down the business of TAST. The lease between LSEM and TAST ended on December 31, 2017. The LSEM Executive Director believed that all TAST affairs were completed as of December 31, 2017, and that Trantham was solely working for LSEM after that time. Trantham never informed the LSEM and CCJ Executive Directors that there were remaining TAST assets after December 31, 2017.

27. In an interview with LSC-OIG investigator, Trantham admitted that after returning to work at LSEM, she worked about 1 hour per week at TAST to wind-down the business, which included contract work for CCJ.

28. According to CCJ's Executive Director, CCJ paid TAST the contracted $1,175/month until the contract expired on December 31, 2017.

29. Based on interviews from CCJ's Executive Director and LSEM's Executive director, all of TAST's contracts were completed and terminated as of December 31, 2017.

30. According to an interview with Trantham on September 1, 2020, TAST had no other contracts or clients other than LSEM and CCJ.

31. According to the LSEM termination of contract letter and LSEM employees, TAST did not provide any services to LSEM after March 31, 2017, or CCJ after December 31, 2017.

**Trantham took TAST funds and did not return them to LSEM.**

32. TAST held a sole bank account, and a business credit card, with JP Morgan Chase Bank. Trantham was issued a TAST business credit card with her name as an authorized signer. Trantham was also a signer on the TAST bank account. The bank account balance as of December 31, 2017, was $49,539.85.

33. Records show that the bank account and credit card remained open and active after December 31, 2017.

34. From January 5, 2018, to February 27, 2019, Trantham received $17,775.30 in direct deposits from the TAST bank account to her personal bank account.

35. From March 2, 2018, to May 10, 2019, Trantham deposited $21,384.54 in TAST checks into her personal bank account. The checks were made out to Teresa Trantham.

36. From December 31, 2017, to July 18, 2019, Trantham used the TAST credit card to make purchases and cash advances, for her personal benefit, totaling $12,326.17. Of this amount, $5,062.00 were cash advances made at casinos. Purchases on the credit card included Dunham's Sporting Goods, Target, local restaurants, and for home furnishings and decor. The credit card balance was paid in full each month from the TAST checking account.

37. On April 1, 2019, Trantham issued a cashier's check for $6,784.54 from the TAST bank account to General RV Center. Records show that the check was used for Trantham to purchase a 2018 Coachman Clipper camping trailer. Michigan Secretary of State records show that on April 9, 2019, Trantham registered a 2018 Clipper trailer to her home address in Montrose, Michigan.

38. In total, Trantham used $51,486.01 in TAST funds for personal use after TAST business had ceased on December 31, 2017. These funds should have been distributed in equal shares to the TAST members, LSEM and CCJ, in accordance with the TAST Operating Agreement. Accordingly, Trantham, knowingly converted $25,743 of LSEM's funds to her own personal use.

**Trantham stole federal funds from LSEM by submitting reimbursement claims for expenses that were paid for by TAST.**

39.     On January 13, 2019, Trantham used the TAST credit card to pay $1,202.59 to the JW Marriott in New Orleans, Louisiana. This credit card charge was paid off from TAST bank account funds on February 19, 2019.

40.     On January 16, 2019, Trantham submitted a reimbursement request to LSEM totaling $1,474.87 for a LSEM-related business trip to New Orleans, LA. On the reimbursement request, Trantham wrote "confusion with company credit card—used personal."

41.     On January 18, 2019, Trantham received an LSEM check reimbursement in the amount of $1,474.87 for travel expenses incurred for the business trip to New Orleans, LA, which was already paid for using the TAST credit card. Trantham deposited the reimbursement check into her personal account on January 18, 2019.

42.     Between January 22, 2019, and July 19, 2019, Trantham used the TAST credit card to pay for personal dental and eye care services totaling $959.65 and $594.51. These credit card charges were paid from TAST bank account funds on February 19, 2019, and July 18, 2019.

43.     On January 23, 2019, and July 17, 2019, Trantham submitted reimbursement requests to LSEM for $959.65 and $594.51, respectively.

44.     On January 25, 2019, and July 19, 2019, Trantham received LSEM reimbursement checks for $959.65 and $594.51, respectively, related to the

11

personal dental and eye expenses originally paid for using the TAST credit card. Trantham deposited the reimbursement checks into her personal account on January 30, 2019, and July 19, 2019, respectively.

45. The reimbursements to Trantham from LSEM on January 18, 2019, January 25, 2019, and July 19, 2019, were allocated to the federal LSC grant in LSEM's records.

**Trantham transmitted signals by wire in interstate commerce to alter Edward Hoort's Will as part of a scheme to fraudulently obtain property from Hoort's estate.**

46. In or about November 2015, Hoort requested a staff attorney at LSEM draft his Last Will and Testament ("Will"). The attorney, in accordance with usual procedures, conducted an interview with Hoort and drafted the Will. Hoort, the attorney, and another witness were present at the signing of the Will on November 13, 2015. The attorney provided an original and copy to Hoort, and retained a paper copy in LSEM's client file. An unsigned, electronic copy of the Will was also stored in LSEM's computer case management system called PIKA.

47. As part of my investigation, I spoke with the attorney, who stated that he clearly recalled that Hoort's wishes were to leave everything to his sister as primary beneficiary, and to Trantham as secondary beneficiary if his sister predeceased him. The attorney also recalled that Trantham was named the executor of Hoort's Will, as well as his financial and healthcare power of attorney.

48. On February 23, 2021, Hoort passed away. On April 8, 2021, the staff attorney was approached by Trantham in his LSEM office. Trantham had with her LSEM's paper client file for Hoort. Trantham claimed that as the executor of Hoort's Will, the court was giving her a hard time because the distribution page from the Will did not appear to be an original, and she thought the attorney made a mistake on that page. The attorney looked at the copy of the Will in LSEM's paper client file, and noticed that the beneficiaries on the distribution page were switched from what he recalled. It showed that Trantham was the primary beneficiary and Hoort's sister was secondary.

49. The attorney accessed LSEM's PIKA computer system and viewed the electronic copy of Hoort's Will, and it too showed that Trantham was the primary beneficiary. The attorney was certain that Trantham was named by Hoort as the secondary beneficiary, not primary.

50. LSEM conducted its own investigation with the use of its IT contractor, and determined that Trantham had altered Hoort's Will. As a result, LSEM terminated Trantham and seized her LSEM laptop on April 15, 2021. LSEM made LSC-OIG and HUD-OIG aware of Trantham's termination, as an investigation was already underway concerning other matters involving Trantham.

51. On February 22, 2022, LSC-OIG interviewed the System Administrator for the company that hosts the PIKA computer system for LSEM. He stated that PIKA

13

is a cloud-based system and the server is located in Fremont, California. The web address for accessing PIKA is "pika.mplp.org/lsem/."

52. The System Administrator stated that Trantham had the highest administrative privileges allowed within PIKA. This privilege allowed Trantham to create "test" user accounts.

53. The System Administrator reviewed metadata from the PIKA system and documented his findings in an April 16, 2021, email to LSEM that stated the following:

> On April 5, 2021, a user at IP address 97.112.17.5 created a new username titled "test" and having the user ID # 1000364. PIKA Document ID # 50826 is titled "Will of Ed Hoort.docx" and was created on April 5, 2021, by the same username "test"/user ID # 1000364. The username "test" only ever accessed the LSEM PIKA from IP address 97.112.17.5. The only other user to ever access the LSEM PIKA from IP address 97.112.17.5 was user ID # 117 which belonged to Trantham.

54. The System Administrator also found that after the username "test" created Document ID # 50826 titled "Will of Ed Hoort.docx", the username "test" deleted a different Document ID # 22369 also titled "Will of Ed Hoort.docx."

55. On May 16, 2021, I seized the original hard drive from Trantham's LSEM-issued laptop and sent the drive to the HUD-OIG Digital Forensics Unit for analysis.

56. The HUD-OIG forensic analysis found the following: The IP Address 97.112.17.5 was found to be associated with activity on Trantham's laptop, to include web history and audio/video calls.

57. A Word .docx file was retrieved from the Recycle Bin for user profile TTrantham. The Word file had been created on October 30, 2015, and last modified on November 13, 2015, which was the day that Hoort's Will was executed. The File System Last Modified date was February 22, 2021, which is the day before Hoort passed away. The document contents were titled "Will of Edward J. Hoort" and read:

> *All to Sister.* I give all of my tangible personal property not effectively disposed of above to my sister, Patricia Johnson, if she survives me.
> *If All Do Not Survive.* If Patricia Johnson does not survive me, I leave all of my tangible personal property not effectively disposed of to my friend, Teresa Trantham.

58. A Word .docx file was retrieved from the Downloads directory for user profile TTrantham and shows it was Created and Last Modified on February 22, 2021, which is the same day the above-noted deleted Will was first saved on Trantham's computer system. The File System Last Modified date was April 5, 2021, which is the same day the Will was shown uploaded to PIKA. The File Name was titled "Will of Ed Hoort (4).docx." The document contents were titled "Will of Edward J. Hoort" and read,

15

> *All to Friend.* I give all of my tangible personal property not effectively disposed of above to my friend, Teresa Trantham, if she survives me.
> *If All Do Not Survive.* If Teresa Trantham does not survive me, I leave all of my tangible personal property not effectively disposed of to my sister, Patricia Johnson.

59. The forensic analysis attempted to retrieve evidence of web access on April 5, 2021, by reviewing Chrome Web History and Chrome Web Visits. The analysis found that the Chrome browser history had been deleted/cleared for this period of time. A review of the Chrome Autofill feature found that user profile TTrantham used the login name "test" on 4/5/2021 to log into a website.

60. The forensic analysis reviewed Chrome Downloads and found that user profile TTrantham downloaded Document ID # 22369 from "https://pika.mplp.org/lsem" on February 16, February 22, and April 5, 2021, and downloaded Document ID #50826 on April 5, 2021, from "https://pika.mplp.org/lsem." Both Document IDs were saved to the TTrantham local Downloads folder and were titled "Will of Ed Hoort.docx."

## Conclusion

61. Based upon the foregoing, probable cause exists to believe that Trantham has violated 18 U.S.C. §§ 666, 641, and 1343.

_____
Special Agent Alexandra Gramer
U.S. Department of Housing & Urban
Development--Office of Inspector General

This affidavit was submitted and received by reliable electronic means, and was attested to by the affiant telephonically on this 16th day of December, 2022.

_____
Hon. Curtis Ivy, Jr.
United States Magistrate Judge

17